Statement of the Case.
MONROE, C. J.
E. A. O’Sullivan, a member of the bar, prosecutes this appeal from a judgment which holds that a fee of $5,259.-12, which has been paid him for services rendered in behalf of the minor Cleo Hanna, “is all that he is entitled to, under the law and the evidence,” and rejects his claim for a further amount of $5,889.83.
It appears from the evidence that Mr. O’Sullivan was, for many years, the legal and confidential adviser of John H. Hanna, the decedent, in whose succession this litigation has been carried on; that Hanna’s wife had preceded him to the grave; that, in the settlement of her succession, some irritation had arisen between him and the widow of his deceased son, Charles; that on that, or some other, account he desired, so far as he could, on the one hand, to exclude Cleo, who was the minor child of Charles, and, on the other hand, to favor his daughter, Elizabeth Lea, in the division of his estate; that, for the accomplishment of those purposes, he consulted Mr. O’Sullivan, upon whose advice, within the year or two which preceded his death, he made an arrangement whereby some $430,000 worth of securities were to appear as having been donated to his five major heirs (being the daughter, whose name has been mentioned, three sons, and a grandson) who were apparently to enjoy and administer the same, through the legal adviser of their father and grandfather, as their mandatary, though, in reality, the father and grandfather never parted with either the control or the possession of the property. In furtherance of the purpose mentioned, Mr. Hanna, on April 20, 1909, made a will, whereby he left his entire estate to his said heirs, to the exclusion of the minor, Cleo, and thereafter, on August 31, 1911, he died. There were then some negotiations between the major heirs and Mr. O’Sullivan in regard to the opening of the succession, the result of which was that four of the heirs, on September 13th, wrote to him, in part as follows:
“After we have thoroughly considered this proposition [meaning a proposition which had been submitted, by him] in all its lights and phases, we have decided to reject same, on the ground that one of the heirs is absent from the city, and we will do nothing as to the hiring of an attorney for the estate, at present. However, the agreement made by Mr. R. J. Hanna, for the research for the will, for the sum of $25, will be carried out in full, and will end your services on [to] the estate for the present. In the future, should we deem it necessary to need your services, we will call upon you.”
On September 23d following Mr. O’Sullivan entered into the contract here sued on *1046 with the tutrix and cotutor of the minor, Oleo Hanna (the tutrix having apparently married a second time), which contract reads as follows:
“September 23d, 1911, New Orleans, La.
“It is agreed between the undersigned attorney at law and Mrs. J. C. Driscoll, natural tutrix, and Mr. J. C. Driscoll, cotutor, of the minor Cleo, that the undersigned attorney at law shall represent the said minor, Cleo, in all matters pertaining to the succession of her grandfather, John H. Hanna, and that, for his services therein, he shall receive 10 per cent, on all sums recovered for the benefit of the said minor, under the original inventory filed, and 25 per cent, on all sums which, through his services, shall be recovered from any supplemental or additional inventory, filed in said succession or from any other source.”
The original (and only) inventory was filed on November 9th, and concludes with the following entry or note, to wit:
“And now before the closing of this inventory, the above-named appearers, John Stonewall Hanna, Robert Hanna, Richard James Hanna, Elizabeth Lea Hanna, and John Hanna I-Ioerner, declared unto me, notary, and to the said appraisers and witnesses, that whereas, although it appears that all and singular the contents of the private box of said Richard James Hanna is herein mentioned as the property of the estate of the late Hanna to wit:
15 shares of Sibley Menge Brick & Coal Co...................... $ 1,500 00
149 shares of Orleans Metal Bed Co., Ltd...................... 7,450 00
40 shares N. O. Railway & Light Co.......................... 3,080 00
2100 shares of N. O. National Bank ....................... 378,000 00
2 shares of Adler Realty Co...... 2,000 00
8 Bonds of Salmen Brick & Lumber Co...................... 8,000 00
15 Bonds of National Manufacturing Co....................... 15,000 00
15 Bonds of Lane Mills.......... 15,000 00
$430,030 00
—the truth is that, in law and in fact, the said property belongs to appearers in equal proportions, and they hereby claim the entirety thereof and protest against its inclusion in this inventory as part of the estate of the late John H. Hanna.”
The attorney for the minor thereupon (on the following day) filed an opposition on her behalf; denying that said stocks and funds belonged to the claimants, and alleging that, if they were ever in their possession, or in the possession of Richard J. Hanna, they or he had gained such possession without right- and after the death of their father; alleging that the executor (said Richard J. Hanna) and his coclaimants had intentionally omitted from the inventory 373 shares of the stock of the Orleans Metal Bed Company, certain shares of the New Orleans National Bank, earrings, watches, diamonds, chains, brooches, and pins, and a large sum of money; and praying that said parties be ordered to show cause why the claim set up by them should not be denied, and why the property mentioned should not be included in the inventory.
There was a trial, which lasted two days, and upon which the only witnesses examined were the four major heirs and the attorney and the tutrix of the minor. The evidence failed to show that any property had been withheld, but, on the other hand, showed conclusively that the claim set up by the major heirs to the $430,030 worth of stocks and bonds included in the inventory was unfounded, and, the matter having been submitted without argument, there was judgment in accordance with the evidence. Thereafter, as it appears, there was a .partition, in which the attorney for the minor is said to have received, on her account, stocks, bonds, and money to the value of $52,591.12; the payment or delivery to him having been made in accordance with a written agreement whereby the rights of the parties with respect to the balance here claimed were reserved. In the agreement in question the total amount said to be due to the attorney of the minor- (áccording to his theory) is said to be $11,945.27, “from which is to be deducted $-, costs advanced by Mrs. Driscoll, amounting to $68, leaving total due the said O’Sullivan of $11,146.05.” According to our understanding of the matter, however, and of the figures, so far as they are disclosed by the transcript and the *1048 briefs, the theory of the present claim is that, apart from the $430,030 of stocks and bonds claimed by the major heirs, the estate to be partitioned amounted to $91,943.25, of which the minor received one-ninth, or $10,-215.91 and the fee ux>on that amount was $1,021.59; but, it is said, the attorney is entitled, under his contract, to an additional 25 per cent, of one-ninth of the $430,030, which would be $11,945.27, making a total of $12,-966.86; from which we deduct $5,259.12, which he has received, and there is a balance of $7,707.74; and deducting therefrom $68 of costs advanced, and the amount still due would appear to be $7,639.74.
Opinion
The appellant testified in support of the claim which he here sets up in part, as follows:
“I had been his attorney for about 12 or 15 years; I suppose confidential friend and attorney. * * * He was very much worried, and desired, above all things, to take care of his daughter, Miss Lea, and he consulted with me as to what to do. The best way to do is by will. I can say this, as the will shows it. He was irritated at certain proceedings had in the succession of Mrs. Hanna, and he desired that the minor child should have nothing but what the law allowed. * * * He wished to give Miss Lea more than her share. ‘I don’t want the boys to come in with her and divide equally with her.’ That was already put in the will — that they should divide equally; so I hit upon this plan, believing that the boys — her sisters and brothers — would maintain it, even if not legal. Necessarily, Capt. Hanna knew that he could not dispose of the entirety of the stocks and bonds in the manner in which we proposed to do it; that the minor child would be entitled to her share, which the law allowed her. The consequence was that I drew up these various receipts, and the interest that the father showed in Miss Lea is evidenced by the number of bonds, or shares of stock of the New Orleans National Bank that he declared she should have. Out of 2,500 shares, he allowed her 601. He frequently asked me: ‘Will that hold?’ I said: ‘To a certain extent— if the coheirs don’t attack it.’ ”
The “that” referred to in the question thus attributed to the decedent appears to have been a fictitious, ante mortem, disposition of about five-sixths of his estate, so tint, after his death, his daughter would get a larger share than her' brothers and nephew, and his granddaughter would get next to nothing. The testimony on the subject proceeds as follows:
“When all this was arranged in our minds, I suggested to him that these different coheirs would appoint me as their mandatary, in order tq bind them, as far as I could, with this division. That is the document that I filed the other day. By that document I was appointed themandatary of these coheirs for the purpose of receiving for them, and in their name, moneys, stocks, and bonds, and things of all kinds of value that might come. There was a special provision in that which showed how guarded both Capt. Hanna and myself were as to the dis-I>osition of those stocks and bonds. In the first place as you can well imagine, the document was of my creation, and it specially provided that those stocks and bonds should be deposited in a place of safe-keeping — the New Orleans National Bank preferred. The question then arose, as these heirs were all majors, whether they could not, at any time, call upon him— since he was going to give it to them — call on him and take them from him. That was provided for by the fact that it was inserted that these stocks and bonds could not be called for and taken out of my presumptive possession, unless by the unanimous call of all the coheirs, and then only after 30 days’ notice, so that all parties were perfectly protected in their respective interests.”
Judging from what we find in the record, however, the major heirs were not, all of them, informed of what was going on. One of them testifies that he signed' the mandate referred to at the request of the decedent, but he evidently did so in ignorance of its contents; and, as to the minor, it is quite clear that, if the plan devised had become effective upon the death of her grandfather, she would have been illegally deprived of the greater part of the interest in his estate to which the law entitled her, and of which he could not have deprived her, save in fraudem legis.
The contract here sued on was made without the advice of a family meeting, and purports to bind a minor for an amount far in excess of her revenue, actual or prospective; it was therefore unauthorized by law, and plaintiff’s claim rests, not upon the contract, but upon the equitable principle that no one *1050 can be enriched at the expense of another, .and that even a minor should, ex aequo et bono, and within certain limits, be held liable to the extent of benefits actually received.
“Where the tutor has created an indebtedness, without authority of law,” this eou.rt has said, “the burden of proof is thrown upon the creditor to show that the indebtedness thus created was absolutely necessary, either to the support of the minors or to the preservation of their property, and that the supplies thus furnished actually inured to the benefit of the minors. The creditor’s claim in such case would rest, not upon any contract, but would be based upon the broad principle of equity that no one has a right to be enriched at another’s expense.” Urquhart v. Scott, 12 La. Ann. 675.
See, also, McWilliams v. McWilliams, 15 La. Ann. 88; Woodbridge v. Pope et al., 22 La. Ann. 293; Bank v. Forstall, 41 La, Ann. 116, 6 South. 32; Keel v. Sutherlin, 130 La. 182, 57 South. 794; Stewart v. Crump, 131 La. 463, 59 South. 903.
The broad principles of equity thus mentioned do not, however, cover the ease of an attorney who, having contrived an unlawful scheme to the prejudice of another, claims compensation for the undoing of his own work. The judgment appealed from is, therefore, affirmed.
O’NIELL, X, takes no part,- not having been a member of the court when the case was argued.
PROVOSTY, X, absent, takes no part.